# NO. 12-19-00137-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

|  |  |  |
|---|---|---|
| *IN THE INTEREST OF L.C.,* | § | *APPEAL FROM THE 349TH* |
| *A CHILD* | § | *JUDICIAL DISTRICT COURT* |
|  | § | *HOUSTON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

R.C. and B.P. appeal the termination of their parental rights. In one issue, they challenge the legal and factually sufficiency of the evidence to support the termination order. We affirm.

## BACKGROUND

R.C. is the father and B.P. is the mother of L.C. On March 8, 2018, the Department of Family and Protective Services (the Department) filed an original petition for protection of L.C., for conservatorship, and for termination of R.C.'s and B.P.'s parental rights. The Department was appointed temporary managing conservator of the child, and the parents were granted limited access to, and possession of, the child.

At the conclusion of the trial on the merits, the jury found, by clear and convincing evidence, that the parent-child relationship between R.C. and L.C. should be terminated. Consequently, the trial court found that R.C. engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D), (E), (N), (O), and (P) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between R.C. and L.C. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between R.C. and L.C. be terminated.

The jury also found, by clear and convincing evidence, that the parent-child relationship between B.P. and L.C. should be terminated. Consequently, the trial court found that B.P. engaged

in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), (M), (N), (O), and (P) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between B.P. and L.C. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between B.P. and L.C. be terminated. This appeal followed.

## UNCHALLENGED FINDING

On appeal, R.C. and B.P. do not argue that the evidence is legally and factually insufficient to support one of the predicate grounds for termination or the finding that termination was in the best interest of the children. A finding of only one ground for termination alleged under Section 161.001(b)(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.–Fort Worth 2007, no pet.). Thus, to be successful on appeal, R.C. and B.P. must establish that the trial court's findings on all the Department's pleaded grounds are unsupported by the evidence. *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston [1st Dist.] 2009, no pet.).

R.C. contends that the evidence does not support termination of his parental rights under subsections (D) (endangerment by conditions or surroundings), (E) (endangerment by conduct), (O) (failure to comply with a court-ordered service plan), or (P) (use of a controlled substance), of Texas Family Code Section 161.001(b). However, in the body of his brief, R.C. fails to challenge the jury's findings on the grounds for termination alleged under subsection (N) (constructive abandonment). Further, B.P. argues that the evidence does not support termination of her parental rights under subsections (D), (E), (M) (termination of another child based on findings of endangerment), (O), or (P), of Texas Family Code Section 161.001(b). However, in the body of her brief, B.P. fails to challenge the jury's findings on the grounds for termination alleged under subsection (N).

Because R.C. and B.P. do not challenge every ground upon which the jury could have based its decision to terminate their parental rights, we have previously not addressed the unchallenged findings or the grounds they chose to challenge in their brief. *See In re A.V.*, 113 S.W.3d at 361–62; *Fletcher*, 277 S.W.3d at 64. However, the Texas Supreme Court recently held that allowing Section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court violates the parent's due process and due course of law rights.

2

***In re N.G.***, 577 S.W.3d 230, 237 (Tex. 2019). In making its holding, the Court relied on subsection (M), which provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on the finding that the parent's conduct was in violation of Paragraph (D) or (E)." ***Id.*** at 234; TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (West Supp. 2018). As a result, the "collateral consequences of terminating parental rights under [S]ection 161.001(b)(1)(D) or (E) are significant." ***In re N.G.***, 577 S.W.3d at 234. "When a parent has presented the issue on appeal, an appellate court that denies review of a [S]ection 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." ***Id.*** at 235. Therefore, due process and due course of law requirements mandate that an appellate court detail its analysis in an appeal of termination of parental rights under Section 161.001(b)(1)(D) or (E) of the Family Code if a parent raises such issues. ***Id.*** at 237. Accordingly, in light of the Supreme Court's decision in ***In re N.G.***, we will consider R.C.'s and B.P.'s sufficiency arguments as to subsections (D) and (E), even though they do not challenge termination under subsection (N).

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. ***Vela v. Marywood***, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); ***In re J.J.***, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. ***Wiley v. Spratlan***, 543 S.W.2d 349, 352 (Tex. 1976); ***In re Shaw***, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2018); ***In re J.M.T.***, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2018); ***Green v. Tex. Dep't of Protective & Regulatory Servs.***, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); ***In re J.M.T.***, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2018); ***In re J.M.T.***, 39 S.W.3d at 237. Both elements must be established by clear and

convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

4

As part of their sole issue, R.C. and B.P. argues the evidence is legally and factually insufficient to terminate their parental rights pursuant to subsections (D) and (E) of Texas Family Code Section 161.001(b)(1).

**Applicable Law**

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West Supp. 2018). Subsection (D) addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775-76 (Tex. App.—Texarkana 2003, no pet.). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.). Further, subsection (D) permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

The court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2018). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. When seeking termination under subsection (D), the Department must show that the child's living conditions

5

pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra*, 869 S.W.2d at 577-78. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re N.R.*, 101 S.W.3d at 776. In other words, conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We have previously concluded it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, is not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). Subsection (D) is designed to protect a child from precisely such an environment. *Id*.

Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed

6

by the Department. ***Walker v. Tex. Dep't of Family & Protective Srvs.***, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

A parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct. ***In re J.O.A.***, 283 S.W.3d 336, 345 (Tex. 2009); *see also **In re R.W.***, 129 S.W.3d at 739. Further, evidence that the parent continued to use illegal drugs even though the parent knew his or her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being. *See **In re M.E.-M.N.***, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); ***Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.***, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under subsection (E). ***Walker***, 312 S.W.3d at 617-18

**Evidence**

This case began when L.C. was born. Emily Pillows, a Department investigator, testified that the Department was concerned that the baby would return to R.C.'s residence when there was an open investigation involving B.P.'s older child and positive drug tests by both parents. B.P. agreed to a safety plan in which she and L.C. would live with her grandparents, and B.P. would supervise R.C.'s visitation with the child. Pillows stated that the investigation was closed.

In March 2018, when L.C. was approximately four months old, Pillows received an intake stating that R.C., B.P., and L.C. were at a residence where methamphetamine was being used. She and Jacob Giroux, a Department caseworker, attempted to contact the parents, but were unable to reach R.C. Giroux telephoned B.P. and informed her that they were on their way to take her to a drug testing facility. When they arrived about ten to fifteen minutes later, B.P. was very defensive and her hair appeared to have been recently dyed. Pillows stated that hair dye was "dripping" down B.P.'s scalp. Initially, B.P. refused to submit to drug testing, became very angry and upset, and told the Department workers to get the "f***" off the property. Pillows and Giroux left only to receive a telephone call from B.P. agreeing to submit to drug testing. On the way to the drug testing facility, Pillows testified that B.P. admitted that she used marijuana and was at the house where methamphetamine was used. B.P.'s hair follicle test on March 6, 2018 was negative. However, Pillows stated that L.C. was removed from R.C.'s and B.P.'s care the next day because the parents took L.C. to a home where known methamphetamine use occurred, R.C. refused to submit to drug

7

testing, and the parents continuously placed L.C. in dangerous situations. According to the records admitted into evidence, R.C.'s urine drug test on March 13, 2018, was positive for marijuana, and his hair follicle test was positive for amphetamines, marijuana, and methamphetamine. Pillows stated that B.P.'s nail test conducted on April 20, 2018, was positive for cannabinoid and carboxy THC.

*Prior Department Case.* B.P.'s older child, P.C., was born in 2016 with gastroschisis in which her intestines formed outside of her belly where her navel should have been. She is medically fragile. In March 2017, B.P. brought P.C. home from the hospital to her grandparents' house. She and R.C. had been together since before P.C.'s birth. The Department became involved after several incidents occurred. The first involved a trip to the doctor's office shortly after B.P. brought P.C. home. A home health nurse arrived to help with P.C.'s care and the family and nurse traveled to the doctor's office in B.P.'s grandparents' vehicle. B.P.'s grandmother stated that B.P. was allowed to drive the vehicle as R.C. did not have a driver's license and the nurse was not allowed to drive the vehicle. B.P. did not tell her grandmother that she was too tired to drive. However, soon after they left, B.P. stated that she was too tired to drive and R.C. began driving. R.C. fell asleep and only woke up when the nurse began screaming. At that point, the nurse drove them to the doctor's office. R.C. blamed the nurse because she refused to drive until he fell asleep.

A few days later, P.C. had to be admitted to Texas Children's Hospital. Both parents blamed B.P.'s grandparents who, they said, had fed P.C. cheese or, as R.C. characterized it, "tried to kill her." According to R.C. and B.P., the child was not allowed to eat food because she was fed through a tube. However, B.P.'s grandmother stated that the parents allowed P.C. to "taste" food and stated that she could do so as long as the food was not "spicy." During P.C.'s hospital treatment, Melissa Cunnyngham, a social worker with Children's, testified that B.P. visited P.C. three times when she was at the hospital and was reported to have visited P.C. one other time on a weekend. Cunnyngham stated that the medical team was concerned with the Department's decision to allow P.C. to return home because of concerns about how P.C. would receive treatment at the home. The medical team was also concerned that B.P. was not visiting very often, P.C. had very special medical needs, B.P. was not trained well, and B.P. would not be able to provide medical services at home.

R.C. and B.P. completed a "rooming-in" process in June 2017 during which the parents were to remain at P.C.'s bedside to learn to care for her. Cunnyngham was concerned that the

parents were not very interested or ready to care for P.C. and contacted the Department. She informed the Department that the medical staff tried multiple times to wake the parents because they were sleeping at the child's bedside. The parents did not seem interested in learning about P.C.'s medical care, told the medical staff that they already knew how to do a particular task, and informed the medical staff that it was someone else's turn to perform a certain task.

Ladedra Wade, the family based safety services (FBSS) worker for the Department, contacted B.P. by telephone on May 19, 2017, to schedule a visit to their home. B.P. stated that she would not work services with Wade and did not want her to come to her home. At that time, Wade also contacted R.C. He told Wade to leave his family alone and not to contact them by telephone. R.C. told her that they were not going to do anything "for" her and that they received a letter stating that the case was closed. She attempted to explain that the investigation involving P.C. was closed. but that the case was open for FBSS services. However, R.C. yelled and cursed at her.

Later, Wade went to B.P.'s residence where the mother minimized the Department's involvement and stated that the Department did not need to be involved in her family. Wade explained about the Department's concerns that R.C. used methamphetamine and B.P. was unable to make good decisions for P.C. As a result of FBSS services, Wade was contacted by Children's Hospital which indicated that no one was regularly visiting P.C. At that point, P.C. was removed from B.P.'s care.

_Drug Use._ The parents continuously tested positive for drug use during both Department cases. During P.C.'s case, R.C. tested positive for marijuana thirteen times, and for methamphetamine four times. After L.C.'s case began, R.C. tested positive for marijuana nine times, and once for methamphetamine. B.P. tested positive for methamphetamine and marijuana once, during P.C.'s case. She tested positive for marijuana seven times since L.C.'s case began. Further, at trial, both parents stated that they smoked marijuana regularly. According to R.C., he smokes marijuana because of daily back pain as the result of a construction accident. B.P. stated that she smokes marijuana every week because it helps the scoliosis in her back.

_Criminal Background._ R.C. was convicted of possession of a controlled substance, methamphetamine, and burglary of a building. He was placed on community supervision for both offenses. However, he violated his community supervision by continuing to use drugs, failing to pay his fees, and failing to appear at court. R.C.'s community supervision in both cases was

9

revoked and in December 2013, he was sentenced to twelve months in jail for both offenses, to run concurrently.

*Service Plan.* The parents did not complete the service plan involving L.C. According to Giroux, the caseworker, a service plan was created for the parents. He noted that R.C. and B.P. completed some services during P.C.'s case and received credit for those services, including parenting classes and psychological evaluations. Giroux testified that he discussed the service plan with both parents, line by line. He stated that R.C. did not agree with the number of Narcotics Anonymous or Alcoholics Anonymous meetings he was required to attend or that he was required to participate in a mental health assessment, stating the he did not have a substance abuse problem. Because of the overlap with the service plan involving P.C., Giroux only referred the parents to counseling. However, after R.C. complained about the difficulty in meeting the tasks, the Department "rolled" all of R.C.'s and B.P.'s tasks into counseling through one counseling center including counseling, substance abuse counseling, and parenting. R.C.'s tasks also included anger management, and B.P.'s tasks included codependency counseling. After these accommodations were made, the parents still refused to work services. According to Giroux, the parents did not meet the goals of demonstrating a willingness and ability to protect the child from harm, or acceptance of the responsibility of being a parent.

R.C. testified that at some point, he refused to "deal" with Giroux and requested that he not call his telephone in order to inform him of visitations with L.C. or request that he submit to drug testing. He also accused Giroux of threatening the well being of L.C. According to R.C., he refused to "redo" parenting classes and refused to attend Narcotics Anonymous or Alcoholics Anonymous meetings for "smoking weed." He also stated that his signature on the service plan involving L.C. was forged. He admitted that using marijuana violated his service plan.

Although B.P. completed substance abuse counseling, she continued to test positive for drugs and, according to her service plan, would be referred to another substance abuse assessment. B.P. believed that the substance abuse assessment was on R.C.'s service plan, not hers, and she never contacted the number provided in the service plan. B.P. admitted that she did not work services regarding L.C.'s case because she completed "half" of them for the case involving P.C. Although she agreed to begin working services in November 2018, she did not.

Both parents submitted to a substance abuse assessment during R.C.'s case. According to the counselor, he recommended that R.C. complete inpatient rehabilitation because of his history

with drugs. R.C. refused, stating that he did not have a substance abuse problem, particularly with marijuana. Further, R.C. resisted outpatient rehabilitation but as of October 2017, was doing well. B.P. was successfully discharged from substance abuse counseling and referred again in December 2017 because she relapsed. She was not discharged from that referral.

Both parents also completed psychological evaluations in P.C.'s case. Dan Boynton, Ph.D., a licensed psychologist, diagnosed R.C. with generalized anxiety disorder, possible post traumatic stress disorder, and substance abuse (in remission). His recommendations included counseling for prior physical, emotional or sexual abuse suffered by R.C., individual counseling for drug and alcohol use, parenting classes, and treatment for post traumatic stress disorder and generalized anxiety which may include counseling and/or medication. R.C. had a "high risk" factor to use corporal punishment. Even though R.C. at one point denied taking any illegal or street drugs at the time of the evaluation, he admitted using "'every drug known to man, including some people had not heard of.'"

Regarding B.P.'s psychological evaluation, Boynton diagnosed her with persistent depressive disorder, i.e., depressed most days for two years or more, but lacking hypomanic or manic episodes. Boynton recommended B.P. attend parenting classes, and obtain treatment for depression, including counseling, and if treatment was not effective, medication. He stated that B.P. may have expectations that exceed the developmental capabilities of children, and had a low level of empathy.

*Stability of the Home.* The parents did not have an appropriate home throughout the case. Giroux visited R.C.'s home on May 26, 2018. R.C. and B.P. invited him into the home, stating that it was not ready and that it had previously been owned by a hoarder. He observed that the house was unsuitable for a young child. There were holes in the floor of the trailer from which a person could see the ground. There was a waist high pile of trash in the living room. There was no working electricity or running water. Giroux was never allowed in the house again.

According to both parents, they were working on the house during the case but admitted at trial, that it was not ready for L.C. R.C. stated that the house lacks running water and his financial situation prevented him from completing repairs on the house. He stated that the house needs a new countertop, costing about $200.00. He admitted that he spends approximately $20.00 per week on marijuana.

11

More troubling, however, is the stability of the parents. During P.C.'s hospitalization in 2017, R.C. became angry and had to meet with hospital security about the rules for his behavior before being allowed to participate in the "rooming-in" process. Further, during a meeting at the Department's office during P.C.'s case, R.C. made a "ruckus," yelling, walking out of the conference, and slamming doors. He left the conference, yelling and screaming as he went outside, and then came back into the office, screaming towards B.P. Law enforcement was called and he was asked to leave the property. According to B.P., she was not concerned because R.C.'s anger was not directed at her nor had he ever been violent towards her. She told the CASA volunteer that she did not consider R.C.'s temper to be an issue because it was never directed against her. However, both B.P.'s mother and the CASA volunteer were concerned about R.C.'s behavior towards B.P., with the CASA volunteer describing it as controlling.

*Parenting Skills.* The parents displayed minimal parenting skills. According to the CASA volunteer, she supervised three visitations between the parents and L.C. In the first visit, she said, B.P. was not able to do much with L.C. because R.C. controlled everything with the baby. She believed that R.C. was not allowing B.P. to participate in taking care of the child. After L.C. was fed, R.C. took L.C. and put him in B.P.'s arms. In less than a minute, R.C. picked the baby up, burped him, and gave the baby back. He stood in front of B.P. with a washcloth and was flicking it at the baby's face. According to the CASA volunteer, R.C. did not allow B.P. time to bond with the baby. During a feeding, the CASA volunteer stated that R.C. prepared the bottle and propped up the bottle under L.C.'s chin. Neither parent picked up the baby to hold and feed him.

In the second visitation that the CASA volunteer observed on August 3, 2018, L.C. cried or screamed for about half the visit. She was struck by the fact that B.P. did not interact much with L.C., but R.C. did. When L.C. would cry, neither parent knew how to soothe him. L.C. was inconsolable. In the third visitation the CASA volunteer observed, L.C. displayed the same behavior as before. At some point during the visitation, L.C. started screaming or crying and it went "on and on and on." The CASA volunteer did not believe that L.C.'s parents displayed the skills necessary to take care of the child's emotional and physical needs.

According to another Department worker, she observed visitations where L.C. also displayed the same behavior, i.e., crying or screaming throughout the visit. She stated that L.C. was "absolutely inconsolable," and would not calm down through the parents' efforts. However, she said, he never cried when she transported him or held him before the parents' visitations.

R.C. stated that L.C. began to fear him for "no reason." He did not know whether L.C. was eating table food or the type of formula he used. When B.P. was living with her grandparents, she had a disagreement about allowing L.C. to cry, stating that she did not want a spoiled baby. During one incident, her grandmother attempted to pick up L.C. and B.P. told her not to touch her baby. According to the grandmother, she told B.P. that she made her so mad sometimes that "[she] could just knock [her] head off." The grandmother said that B.P. responded, "Go for it, bitch." However, there was some evidence that B.P. and R.C. were good parents, feeding, changing, and bathing L.C.

*Transportation and Employment.* Both parents were employed and together earned about $2,800.00 per month and, as B.P. testified, their bills are about $765.00 per month. However, B.P. stated that there is very little money left at the end of the month and that some of that money is used to purchase drugs. Further, the parents lacked reliable transportation throughout the case. According to R.C., he did not believe that he needed a driver's license because "federal laws" state that he does not need a driver's license and that he is a United States citizen. R.C. complained that he lacked transportation to participate in services and that the Department refused to provide it. However, he stated that he had reliable transportation through a friend to attend work. Both parents stated that they lacked transportation to participate in their service plan. Nonetheless, B.P.'s grandmother testified that they provided daily transportation for B.P. to attend work and both her grandparents and mother were available to provide transportation. The Department could also provide transportation if given enough time to arrange it.

**Termination of R.C.'s parental rights**

From the above evidence, a reasonable fact finder could have formed a firm belief or conviction that R.C. used drugs regularly, refused to cease using drugs, was emotionally unstable, lacked interest in caring for the older child, attempted to control B.P.'s access to L.C. during visitations, and lacked stable housing and transportation. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The jury could have also determined that R.C. refused to cooperate with the Department in both cases, did not complete his service plan, violated his service plan by continuing to use drugs, and lacked parenting skills to care for the child. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that R.C. knowingly placed or knowingly allowed L.C. to remain in conditions or surroundings that

endangered the physical or emotional well being of the child, and engaged in conduct or knowingly placed L.C. with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See* ***In re J.F.C.***, 96 S.W.3d at 266.

Although R.C. argued that the child was healthy and happy, living in an appropriate home, and there was insufficient evidence of his ability to complete the service plan, this evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that R.C. knowingly placed or knowingly allowed L.C. to remain in conditions or surroundings that endangered the physical or emotional well being of the child, and engaged in conduct, or knowingly placed L.C. with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See* ***In re C.H.***, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of R.C.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule R.C.'s sole issue as to subsections (D) and (E) of Texas Family Code Section 161.001(b).

## Termination of B.P.'s parental rights

From the above evidence, a reasonable fact finder could have formed a firm belief or conviction that B.P. used drugs regularly, refused to cease using drugs, lacked interest in caring for the older child, lacked discernment regarding R.C.'s emotional stability and its impact on her and her children, and lacked stable housing and transportation. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The jury could have also determined that B.P. refused to cooperate with the Department in both cases, did not complete her service plan, violated her service plan by continuing to use drugs, and lacked parenting skills to care for the child. *See* ***id.*** Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that B.P. knowingly placed or knowingly allowed L.C. to remain in conditions or surroundings that endangered the physical or emotional well being of the child, and engaged in conduct or knowingly placed L.C. with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See* ***In re J.F.C.***, 96 S.W.3d at 266.

Although B.P. argued that the child was healthy and happy, living in an appropriate home, and there was insufficient evidence of her ability to complete the service plan,, this evidence is not

so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that B.P. knowingly placed or knowingly allowed L.C. to remain in conditions or surroundings that endangered the physical or emotional well being of the child, and engaged in conduct, or knowingly placed L.C. with persons who engaged in conduct that endangered the physical or emotional well being of the child. *See In re C.H.*, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of B.P.'s parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule B.P.'s sole issue as to subsections (D) and (E) of Texas Family Code Section 161.001(b).

## DISPOSITION

Having overruled R.C.'s and B.P.'s sole issue, we *affirm* the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered September 27, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

15



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 27, 2019**

**NO. 12-19-00137-CV**

**IN THE INTEREST OF L.C., A CHILD**

Appeal from the 349th District Court
of Houston County, Texas (Tr.Ct.No. 18-0062)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*